UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

JUNE 21, 2023
MOTION HEARING
BEFORE THE HONORABLE TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

- - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| CLINTON PRESTLEY | 5:23-CV-143-BO-RN |
| TERRANCE SHINE | 7:23-CV-23-B0-BM |
| DEAN H. HOLMES | 7:23-CV-29-BO-RJ |
| GREGORY JOHNSON | 7:23-CV-30-BO-BM |
| THOMAS HOBBS | 7:23-CV-40-BO-RN |
| BARRY A. BARAK, JANE BARAK | 7:23-CV-42-BO-RN |
| COMETTO DAVIS, WENDY DAVIS | 7:23-CV-43-BO-BM |
| BRENDA BRUNDAGE | 7:23-CV-62-BO-BM |
| DAVID TOMILSON | 7:23-CV-63-BO-RN |
| RONNIE GUINN | 7:23-CV-72-BO-RJ |
| BEVERLY McCLAIN, as personal representative of the estate of Rudy McClain | 7:23-CV-73-BO-BM |
| FRED PALUMBO, as person representative of the estate of Joan S. Palumbo | 7:23-CV-74-BO-KS |
| KERRICK W. BREEN, as personal representative of the estate of Christine M. Breen | 7:23-CV-83-BO-BM |
| DAN B. WAX | 7:23-CV-84-BO-RN |
| DARLENE BROOKS | 7:23-CV-89-BO-RN |
| PATRICIA WARREN, as personal representative of the estate of Roseanne Warren | 7:23-CV-91-BO-BM |
| EDWARD LUTHY, Jr., as personal representative of the estate of Charlotte Luthy | 7:23-CV-93-BO-RN |
| MELODY RICHARDS | 7:23-CV-94-BO-RN |
| ANDREA MICHELE WEINER | 7:23-CV-95-BO-RN |
| ALFRED E. BENSON | 7:23-CV-96-BO-RN |
| THOMAS D. CLARK | 7:23-CV-99-BO-RJ |
| MARK EDWARD PERRY | 7:23-CV-103-BO-RJ |
| CAROLYN GLOVER | 7:23-CV-114-BO-BM |
| THEODORE ANTHONY GREEN | 7:23-CV-116-BO-RJ |

| | |
|---|---|
| ELIZABETH S. AKERS, as personal representative of the estate of Paul C. Akers | 7:23-CV-120-BO-RN |
| ROBERT FRANCIS LOFTUS | 7:23-CV-140-BO-RJ |
| MARY BAILEY | 7:23-CV-149-BO-KS |
| GARY BAILEY | 7:23-CV-151-BO-RJ |
| CYNTHIA CAROL WEEKS | 7:23-CV-154-BO-KS |
| MICHELLE FUJAREK FITZPATRICK | 7:23-CV-172-BO-BM |
| WILLIAM DAILY | 7:23-CV-173-BO-RJ |
| PAUL MARTIN PULETZ | 7:23-CV-197-BO-BM |
| RONERT GRADY JACKSON | 7:23-CV-200-BO-RJ |
| RICHARD OLLER | 7:23-CV-208-BO-RN |
| WILLIAM JAMES WALKER | 7:23-CV-216-BO-BM |
| EDWARD McFADDEN | 7:23-CV-222-BO-BM |
| ALAN J. PINGREE | 7:23-CV-223-BO-RJ |
| ARIEL D. ALVARADO | 7:23-CV-225-BO-KS |
| RALPH BLACKMAN, Jr. | 7:23-CV-239-BO-RN |
| JAMES WILSON BOGGESS | 7:23-CV-242-BO-RJ |
| CHRISTOPHER CAIN SANDERS | 7:23-CV-247-BO-RN |
| CRAIG UNTERBERG | 7:23-CV-252-BO-RJ |
| JOHN HOLSCLAW, as personal representative of the estate of Brenda Sue Holsclaw | 7:23-CV-255-BO-RN |
| LYNN SOWDERS, a personal representative for the estate of John Sowders | 7:23-CV-259-BO-RJ |
| JOANNE COTTERELL | 7:23-CV-260-BO-BM |
| JOHN J. ORUE | 7:23-CV-277-BO-RN |
| KAREN AMSLER | 7:23-CV-284-BO-BM |
| JOHNNY SANDERSON | 7:23-CV-285-BO-BM |
| EMILY LINDE | 7:23-CV-288-BO-RN |
| DUANE SNYDER | 7:23-CV-291-BO-BM |
| JANET SORDELLO | 7:23-CV-295-BO-KS |
| JANIE SHAW | 7:23-CV-298-BO-RN |
| JAMES THOMASSON | 7:23-CV-299-BO-BM |
| JULANE GREELEE | 7:23-CV-304-BO-BM |
| JAMES SPELATIS | 7:23-CV-305-BO-RJ |
| JACKIE MILLS | 7:23-CV-306-BO-BM |
| EDDIE PEABODY | 7:23-CV-316-BO-KS |
| SANDRA HILLARD | 7:23-CV-317-BO-BM |
| KEITH RIDGLEY | 7:23-CV-327-BO-RJ |
| STEPHEN ABARNO | 7:23-CV-329-BO-KS |
| GARY BLUETTE | 7:23-CV-335-BO-BM |
| LYSA LONGO | 7:23-CV-337-BO-RN |
| DARYL McINTYRE | 7:23-CV-345-BO-KS |
| JOSEPH MELIONE | 7:23-CV-347-BO-BM |
| VINCENT CRESPIN | 7:23-CV-348-BO-RJ |
| RAYMOND OSSMAN, III | 7:23-CV-358-BO-RN |
| BONNIE ELLIS | 7:23-CV-359-BO-RJ |
| CANDY ESTELLE | 7:23-CV-361-BO-RJ |
| KENNETH FERRIER | 7:23-CV-364-BO-BM |

| | |
|---|---|
| ANDREW RINGLER | 7:23-CV-365-BO-KS |
| BARBARA HANKS | 7:23-CV-377-BO-RJ |
| NILES HART | 7:23-CV-378-BO-BM |
| DWAYNE HOSTRANDER | 7:23-CV-379-BO-BM |
| GARY SMITH | 7:23-CV-387-BO-KS |
| DEAN SOUTHWICK | 7:23-CV-388-BO-RJ |
| SHARON SOUZA | 7:23-CV-389-BO-BM |
| ESTELLE RIVERA | 7:23-CV-395-BO-RJ |
| RAFAEL RIVERA | 7:23-CV-396-BO-RN |
| KIM ANN CALLAN | 7:23-CV-397-BO-BM |
| GARRY ARBOGAST | 7:23-CV-399-BO-KS |
| JAMES CASON | 7:23-CV-416-BO-RJ |
| MATTHEW CHAPIEWSKI | 7:23-CV-417-BO-RJ |
| NORMA DANIELSON | 7:23-CV-421-BO-KS |
| DORIS CARLSON | 7:23-CV-425-BO-BM |
| ERNEST HUNT | 7:23-CV-452-BO-BM |
| CHARLES JAMES | 7:23-CV-453-BO-BM |
| JAMES BROWN, Jr. | 7:23-CV-463-BO-RN |
| CYNTHIA MASCIANGIOLI | 7:23-CV-464-BO-BM |
| CHARMIAN MCCORMICK | 7:23-CV-465-BO-RJ |
| VINCENT HAMILTON | 7:23-CV-473-BO-RJ |
| ARCHIE HARRIS | 7:23-CV-475-BO-RJ |
| DONNA HARRIS | 7:23-CV-477-BO-RN |
| ROBERT HOLLAND | 7:23-CV-486-BO-BM |
| PATRICIA ANN HOLT | 7:23-CV-488-BO-RJ |
| MICHAEL HOUDLETTE | 7:23-CV-489-BO-BM |
| GREGORY THOMAS | 7:23-CV-494-BO-BM |
| MARGARITA THOMAS | 7:23-CV-495-BO-RJ |
| MARINDA TURNER | 7:23-CV-498-BO-RN |
| RONALD WALKER, Sr. | 7:23-CV-499-BO-RJ |
| TERRI WEBB | 7:23-CV-504-BO-RN |
| ALLEN WASHINGTON | 7:23-CV-517-BO-RN |
| RONALD JOHNSON | 7:23-CV-520-BO-RJ |
| KENNETH MANERS | 7:23-CV-527-BO-KS |
| ALAN ZINN | 7:23-CV-533-BO-RJ |
| JEFFREY COOK | 7:23-CV-534-BO-RN |
| DANIEL MCTIERNAN | 7:23-CV-535-BO-RN |
| DONALD NICHOLS | 7:23-CV-537-BO-KS |
| ROSEMARY PESCE | 7:23-CV-542-BO-BM |
| EDWARD RAYMOND | 7:23-CV-546-BO-KS |
| JOHN RIFFE | 7:23-CV-550-BO-KS |
| JAMES STANLEY | 7:23-CV-557-BO-RN |
| DARREL STEWART | 7:23-CV-558-BO-BM |
| PHILIP AMRHEIN | 7:23-CV-560-BO-RJ |
| RUSSELL BARBUTO | 7:23-CV-562-BO-RN |
| RONALD CORIELL | 7:23-CV-566-BO-KS |
| MARK CAGIANO | 7:23-CV-569-BO-RN |
| GARY CLIFFORD | 7:23-CV-574-BO-BM |

| | |
|---|---|
| CHARLES HAJEK | 7:23-CV-580-BO-KS |
| COLLEEN GANEY | 7:23-CV-729-BO-RN |
| DANA HAGEN | 7:23-CV-805-BO-KS |
| DARRELL KING | 7:23-CV-811-BO-RJ |
| ROBERT TIPTON | 7:23-CV-814-BO-RJ |

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

ATTORNEYS FOR PLAINTIFFS PRESENT:

James Edward Bell, III, Kevin R. Dean, Mona Lisa Wallace, Joel R. Rhine, Nevin Wisnoski, Zina Bash, and Hugh R. Overholt.

ATTORNEYS FOR DEFENDANT PRESENT:

John A. Bain and Haroon Anwar

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

(Wednesday, June 21st, 2023, commencing at 2:00 p.m.)

P R O C E E D I N G S

THE COURT: Good afternoon to everyone.

We're here on a motion to strike and other matters that may arise during the course of this proceeding.

Let's see, I'll hear from the plaintiffs first on that and then from the defendant.

Mr. Bell, are you the person who wants to speak primarily?

MR. BELL: Yes, Your Honor.

THE COURT: I'll recognize you.

MR. BELL: Please the Court, Your Honor.

The plaintiffs believe, Your Honor, that the defenses that we've asked to be stricken should be stricken.

This is a very unique statute. It's -- some people say it's akin to a strict liability statute; some say it's not, but we think it actually is a very different statute that requires two things: Plaintiffs prove they were in the base for 30 days and they were harmed.

So the question about some of the defenses that were raised, for example, contributory negligence, we just can't see how that would apply.

Now, Judge, recognizing that this is a new issue, a new statute, there's not a lot of case law on it. I think this might be the first case law, is if you do strike the defenses,

which we would urge you to do, we'd like for you to do so without prejudice so if something during discovery comes up, the Government thinks they have a defense they could raise, they wouldn't be prejudiced so we have a good record going down the road.

THE COURT: What about the *Twombly* and *Iqbal* rules about adequacy of pleading?

MR. BELL: I think, Judge, as we go down the road, this is a lot simpler case than a lot of people think it is. It's a -- and maybe if we're going to be talking about scheduling and things like that, we can address that issue.

But the -- some defenses, we believe, are clearly not appropriate. The Government has asked to have two defenses or set-off. However, in our opinion try to redefine what the statute says. I think they recognize one of them was -- I believed they agreed to take one out and not agree to take the other out.

So we think our position is solid, Your Honor. But we do recognize that because of the uniqueness of the statute that during discovery there may be an opportunity to argue if one of these defenses should be allowed. We don't want to prejudice them for that because we want to have a good record.

THE COURT: Is that all you want to say?

MR. BELL: I think that's all I need to say, Your Honor.

THE COURT: All right. I'll hear from Mr. Bain, is it?

MR. BAIN: Yes, Your Honor. Thank you, Your Honor. May it please the Court.

The Camp Lejeune Justice Act places an unprecedented burden on the Court and the parties to achieve results that are fair and expeditious for all claimants.

Plaintiffs' motion to strike illustrates one of the reasons why the Camp Lejeune Justice Act litigation should have global case management.

Different judges in this district have applied different standards to motion to strike affirmative defenses; therefore, the Court should defer ruling on this issue until there's a master complaint and master answer and there are procedures for global case management in place. To proceed otherwise creates a risk of inconsistent decisions, which is what global case management is designed to avoid.

The United States' position is that the *Twombly/Iqbal* standard should not be applied to affirmative defenses in an answer and for that reason the plaintiffs' motion to strike should be denied. There are good reasons why *Twombly/Iqbal* should not be applied to affirmative defenses, particularly in mass tort cases where hundreds of plaintiffs have simultaneously filed claims against a defendant.

THE COURT: This is not a negligence case; it's a

statutory case.

MR. BAIN: It is a statutory case, but it's a remedy that sounds in tort, so it is similar to other mass tort cases.

THE COURT: How would contributory negligence in any event apply in this case?

MR. BAIN: Well, as Mr. Bell alluded to, this is a brand new statute, Camp Lejeune Justice Act. There is no precedent interpreting the statute, and we're not moving to dismiss; we're just preserving our defenses.

As I mentioned, the statute appears to provide a tort remedy for personal injury or wrongful death caused by exposures of contaminants in the Camp Lejeune water. Under that understanding, each of the affirmative defenses that we've asserted have a good faith basis in law with potential factual predicates, and I can address each of those in turn.

But turning to the defenses that we have alleged with respect to assumption of risk, contributory negligence --

THE COURT: How would people assume the risk? Who would know the water was poison?

MR. BAIN: Your Honor, we're not suggesting in any way that the plaintiffs or the claimants are responsible for their own interest. However, there have been claims made in some complaints that certain employees of the Navy at Camp Lejeune and certain officers were aware of the contamination in the early 1980s and failed to take appropriate actions in

response to that.

Under the terms of the statute, which covers anyone who was at Camp Lejeune from 1953 to 1987, those individuals are potential plaintiffs. There are very --

THE COURT: So you think they knew the water was poison and they said, "That's fine with me. I'll go ahead and drink it and shower with it."

MR. BAIN: They knew that there was some contamination as alleged in some of the plaintiffs' own complaints. Those contaminants were not regulated at the time. They may have continued to drink the water knowing what the laboratory results were.

We think it's a very, very limited number of plaintiffs, but the statute covers such a long range of people that those people who the own plaintiffs' complaints have alleged knew about the contamination and failed to take action are potential plaintiffs under the statute.

THE COURT: How many cases are in the administrative process now?

MR. BAIN: There are approximately 70,000 claims.

THE COURT: How many of those have you made offers in?

MR. BAIN: Your Honor, I would like to address that, if I could. There have been no offers that have been made yet; however, the Navy is committed to paying valid claims as fairly

and expeditiously as possible.

THE COURT: When would you do that?

MR. BAIN: Excuse me?

THE COURT: When would you do that?

MR. BAIN: They will be doing that soon.

THE COURT: What does "soon" mean?

MR. BAIN: Soon would be --

THE COURT: A year from now?

MR. BAIN: Not a year from now. Not a year from now.

THE COURT: We're running up -- excuse me for being in a dialogue, but I think that's a productive way to discuss things.

We're running up on the one-year anniversary of the Act now.

MR. BAIN: Yes.

THE COURT: And six months from February 10th or 11th will be the beginning -- will be the first period of filing in this court.

MR. BAIN: Could I give some -- Your Honor, could I give some background about where the Navy is in the claims?

THE COURT: That would be most helpful.

MR. BAIN: Over the last many months, the Navy has been marshaling personnel and information technology resources in order to fairly evaluate the claims and make appropriate offers.

Before the passage of the Camp Lejeune Justice Act, the Navy's Tort Claims Unit processed approximately 2000 claims per year with 22 employees.

THE COURT: During the MDL?

MR. BAIN: This was just all their claims throughout the country, any tort claims, medical malpractice --

THE COURT: Not specific to Camp Lejeune?

MR. BAIN: No. These are medical malpractice, truck accidents, slip and falls.

So they get about 2000 claims per year, and they have 22 people in Norfolk who handle those claims. That was their yearly average.

So with the passage of the Camp Lejeune Justice Act, they had to marshal resources to handle these influx of claims. They have now set up a separate unit, the Camp Lejeune Claims Task Force, that's presently staffed with 36 active and reservists, Judge Advocate General officers, as well as civilian employees who have experience from this Tort Claims Unit. The task force is now in the process of hiring 50 additional attorneys to join this unit, as well as a number of paralegals, IT, and support staff.

Even before the Act was passed, the Navy started looking into software solutions to manage the influx of claims that it was potentially going to get up to a million claims. And shortly after President Biden signed the statute, they put

out bids for contracts for IT Solutions to manage this number of claims.

THE COURT: I hope you would agree with me that one of the ways to energize the disposition of all these claims is for it to take place in the administrative process; that the administrative process is uniquely suited to deal with the claims on an immediate basis and not have them come to Federal Court for jury trials.

MR. BAIN: That's correct, Your Honor. And we're working on processes to be able to fairly adjudicate the claims at the administrative stage.

So the Navy is marshaling all of these resources, but they need to set up a system that is going to be not only expeditious but it's going to be fair so that it treats similar claims similarly and that it provides --

THE COURT: What's the standard of proof within the administrative process, same as in the Court?

MR. BAIN: The proof that will be required -- as you may know from the FTCA process, all that's required in a claim is essentially a statement of what your claim is and a sum certain. So the Navy needs more documentation in order to make an evaluation and make an offer. So it's a multifaceted process.

It's not going to be the same as the proof required in a court case, but they are going to need information

regarding the diagnosis of the disease and certain information about whether the person was at Camp Lejeune.

THE COURT: Does the Navy have authorization from its command to actually monetize claims to actually pay amounts of credit on the United States?

MR. BAIN: That is going to be forthcoming soon, we anticipate.

THE COURT: But you don't have it right now?

MR. BAIN: Not right now. It has to be done in conjunction --

THE COURT: So you couldn't -- for the past -- what are we into, 11 months or so? So for the past 11 months, you don't have a dollar that you can contribute to settling a case?

MR. BAIN: Well, that's not necessarily the case. Given these cases, the Navy has to coordinate with the Department of Justice. So they would have to come to us with recommendations, and then the --

THE COURT: They don't have the independent authority to settle cases?

MR. BAIN: Not for these cases, no, because the aggregate amount is far beyond what their settlement authority is independently at the Navy.

THE COURT: Thank you for your candor. Some of us are under the impression that any settlement within the administrative process is charged against the Navy's budget.

MR. BAIN: That's not --

THE COURT: Is that true?

MR. BAIN: It comes out of the judgment fund, which is the fund that pays claims against the United States over a certain amount.

THE COURT: Even within the administrative process?

MR. BAIN: That's correct, Your Honor.

THE COURT: So there's no impediment budget-wise to making settlement payments?

MR. BAIN: Not budget-wise. It has to do with the authority through the coordination with the Department of Justice that has to be done.

THE COURT: So the DOJ is involved in approving administrative settlements?

MR. BAIN: In this circumstance, yes.

THE COURT: Was that the way the law was structured or is that an add-on that you developed?

MR. BAIN: That had nothing to do with the Camp Lejeune Justice Act. That's the way the regulations are set out for tort claims generally.

So tort claims that go over a certain amount have to be approved in coordination with the Department of Justice. And there's also an aggregate rule that if the aggregate claims go over a certain amount, then even if an individual claim is under that amount, it has to be approved by the Department of

Justice.

So the challenge is the number of claims, the evaluation that the Navy has to do, the process with working with the Department of Justice to get approval --

THE COURT: So not to be -- not to interrupt, but to share with you the dialogue. You've got 70,000 live claims in the administrative process and about 1300 cases or 1400 cases here and in all of those 70,000 claims the Department of Justice has to be a partner in agreeing to settle them.

MR. BAIN: That's correct, Your Honor.

THE COURT: Okay.

MR. BAIN: So we are working now with the Navy to develop procedures which will expedite the making of offers on claims and will also try to do it in a way that's fair to the claimants and also fiscally responsible. And that's what we're working on and hope to be able to implement it soon.

As I said, it's a very high priority for both the Department of the Navy and the Department of Justice.

On the motion to strike, I would just -- you know, I just want to reiterate a couple points that our position is that *Twombly/Iqbal* should not apply to affirmative defenses. That seems to be the new majority position of courts in this district.

I appreciate Your Honor in the *McGinity* case had a different position many years ago, but I think that the

position now has shifted that *Twombly/Iqbal* does not apply to affirmative defenses. And that's what the position of the Government is based, on the language of Rule 8, which has a different pleading standard set out for allegations that are made in a complaint in which there must be a showing of a predicate for relief and the allegations in affirmative defenses which must just be short, plain statements of defenses.

So the language of Rule 8 supports the fact that *Twombly* and *Iqbal* should not apply to affirmative defenses.

We also believe that, as I said, each of our affirmative defenses have a basis in law. So, for example, the affirmative defense that we submit that there's a failure to state a claim for relief, whether or not *Twombly* or *Iqbal* applies to affirmative defenses it --

THE COURT: Well, some of the claims are not adequately supported where the plea of injury is a gross condition or some -- I don't know. There's a term that the plaintiffs are using, and clearly that's not an adequate description of the loss or the injury.

MR. BAIN: That's correct, Your Honor. So that's one of the bases that might be an argument made that the claim has failed to state a claim for relief. It just says "serious injury." Or with respect to exposure, the claims almost always just recites the element of the statute between August 1st,

1953, and December 31st, 1987, the plaintiff worked, resided, or was otherwise exposed for greater than 30 days to the water at Camp Lejeune. That's just a restatement of the element of the statute. It doesn't say anything about when, where, or how the plaintiff was exposed to contaminated water, which is significant since several of the water systems at Camp Lejeune were never contaminated.

United States reserves the right to challenge plaintiffs' complaints under Federal Rule Civil Procedure 12(c) for failure to state a claim. It's incongruous for the plaintiffs to challenge the United States' affirmative defenses when their claims are so formulaic themselves.

There are a number of other claims if you -- defenses that I could address if you'd like, Your Honor.

THE COURT: Yeah. I'm not going to have a hearing every day, so we're live on the scene today and it's my hope that we can be constructive; that this can advance the entire package; that it's not singled out; what this part of the Court does today contributes to the effort of the entire court because we're very much in agreement on the need to act universally.

So you have this opportunity to have sort of a pit stop in the middle of the race, and we'll go from there.

MR. BAIN: Okay. Well, let me address, then, some of the other affirmative defenses. So, for example, the

plaintiffs also wrongly challenge the affirmative defenses on third-party causation. Causation is a stated element in the Camp Lejeune Justice Act and its standard tort law, the defendant cannot be liable for harm caused by others.

Here, it will be undisputed that the contamination of Camp Lejeune's Tarawa Terrace water system was caused by the practices of the ABC Dry Cleaners which is a private off-base company.

Depending on the specific circumstances of the plaintiffs' exposure, which again have not been alleged with any particularity in the plaintiffs' complaints, third-party causation defenses may be implicated.

Plaintiffs also wrongly challenge the affirmative defenses based on offset. One defense is based on the statutory offset provision that's in the Act itself, and the other defense is based on the Supreme Court statement in *Brooks versus United States*.

The United States agrees with the plaintiff that the Camp Lejeune Justice Act's offset provision is for a disability award, payment, or benefit provided that has to be related to the Camp Lejeune water, and the United States can revise that affirmative defense to make that explicit.

The United States does not agree that the value of services rendered is an inappropriate offset under the statute. The value of services rendered could be a benefit provided

under the statutory language, and whether that value qualifies as a benefit under the statute should be decided -- should not be decided on the plaintiffs' motion to strike, but should be subject to fuller briefing in an appropriate factual evidentiary context.

Whether the United States is entitled to the additional offset stated in *Brooks versus United States* should also be subject to briefing. The fact that the statute specifies particular offsets and not others did not necessarily mean that Congress intended to foreclose the other offsets and allow plaintiffs to basically get a double recovery from the United States such as compensation for medical services that are paid for by Tricare Insurance for military members.

So I think that that is all I want to say about particular affirmative defenses unless Your Honor has other questions about them.

THE COURT: I don't at this time.

MR. BAIN: Thank you, Your Honor.

THE COURT: Okay. I'll hear from some of the other plaintiffs' attorneys.

Yes, ma'am.

MS. BASH: Your Honor, Zina Bash from Keller Postman.

THE COURT: Yes.

MS. BASH: I wanted to address the *Iqbal* issue. As Your Honor knows, there's disagreement among the courts. We

think that *Iqbal* should apply consistent with your 2020 decision. And it has been applied by other courts in this circuit as recently as earlier this year, so I don't think that there's a majority position.

But what we'd like to flag is that whether or not *Iqbal* applies, their defenses still do not meet the plain text of Rule 12(f) which allows for the rejection of defenses if they are insufficient or immaterial. So we think that that insufficient prong imports an *Iqbal*-like standard. There cannot be formulaic boilerplate defenses.

So, for example, even the color that Mr. Bain added about Tarawa Terrace, that's not in here, right? So we wouldn't know exactly what it is that we're up against without more precision in the answers. So we would ask for at least the plain text of Rule 12(f) to apply. We think a lot of them should be struck under that, the insufficiency.

And then immateriality, the assumption of the risk, for example, and the offsets and the contributory negligence are just not material, right? So the statute isn't about negligence. So contributory negligence should not be an excuse.

And our position is that the offsets -- they've offered to amend Answer Number 7 which we believe should be amended. We would ask for more precision to say precisely what the statute says; that it's only about benefits received in

connection with the water at Camp Lejeune, not just Camp Lejeune at large, because that's broader.

But on Answer Number 8 where they are just trying to create, you know, an offset for any -- the value of any of the services rendered based on the *Brooks* decision, what I would say is that that *Brooks* decision, a 1949 case that long predates the Justice Act, even in that case the Supreme Court made clear that the offsets would not be permitted, if doing so would conflict with the statute. And we think that in this case the broad offsets that the Government would like to impose conflict directly with the text of the statute which has very limited language about the types of offsets that it will allow.

So aside from being, you know -- the decision, the Supreme Court decision itself says to look to the statute and whether the additional offsets conflict, it was also dicta. The Court noted that the issue had not been briefed and that it was not resolving anything definitively. So we would not think that the *Brooks* decision should allow these broader offsets that the Government is now proposing.

I understand the failure to state a claim for some of the complaints, but, you know, the complaint that I'm here on today, Ms. Colleen Ganey versus the United States, lists all of the -- all of the elements of the statute, not in a formulaic way. It gives very specifics. And same thing for I think many, if not most, of our complaints.

So I think, again, on the assumption of the risk defense, the contributory negligence defense, and the mitigation of damages defense, I think all three of those fail under Rule 12(f) whether or not *Iqbal* applies, even though our position is that *Iqbal* should apply to all of these.

Your Honor, would you mind if I say just a few words about my client, Ms. Colleen Ganey?

THE COURT: That's fine.

MS. BASH: Mr. Dowling and I spoke with her last week in anticipation of these hearings. We like to just update our clients whenever we are going to be here on their cases, and she asked us to tell the Court a little bit about her because she could not be here today.

So Ms. Ganey was born in 1961 and lived the four years of her life on the base at Camp Lejeune. Her father was a lieutenant colonel stationed at Camp Lejeune.

She left the base at four years old and kind of proceeded. She was ill a lot, but nothing particularly heavy until her last year of college she came down with ALS and developed symptoms very quickly. Within four years she became quadriplegic. So though she had one year left in college, she persevered and it took her 10 years to graduate, and she ultimately did.

But this disease really robbed kind of the career she had hoped for and the life that she had hoped for. She was

never able to marry or have children. And now in her fifties she is living with her mother, the widow of the lieutenant colonel, Ms. Ganey, who is 90 years old. And Colleen's biggest fear is that she will lose her only caretaker, her mother, and be institutionalized.

So all of us have clients with similarly heavy stories, and we just wanted to underscore the reason for the rush. This is a very complex case, and we think that narrowing the issues for the Court by striking defenses that should not apply here aids toward the efficiency that we're all looking for.

And the last thing I would say, Your Honor, when we were about to get off the phone, Ms. Ganey asked if I could bring a picture of her to court. Mr. Dowling pressed back that it wasn't necessary; the Court would understand she's not in a condition to be here today, and she insisted that we at least bring it, so I have that here with me today. I'm happy to leave it with the Court, but I just wanted to offer it because she specifically asked and insisted that we bring it, and so we have it here today.

THE COURT: No case is a number; every case is a human story, and so I appreciate that.

MS. BASH: Thank you, Your Honor.

MS. WALLACE: Your Honor, if I may.

THE COURT: Ms. Wallace.

MS. WALLACE: I'm Mona Lisa Wallace. I'm here with Wallace and Graham and I'm also here with these gentlemen who will speak on their own behalves.

But we're here because we actually filed a motion to strike all of the Government's defenses. We don't normally ever do that. We did not do that in the Smithfield cases. We've never done it.

We did it in these cases because we feel so strongly about the need to get these cases moving as quickly as we possibly can.

We will be in D.C. on Monday --

THE COURT: I'm sorry. You'll be what?

MS. WALLACE: If I may sit, is that okay, so you can hear me? I'm sorry.

We're working on the fact sheet with the Justice Department. We filed the joint motion with the Justice Department. We're hoping for an early resolution --

THE COURT: Resolution of what?

MS. WALLACE: These cases. At least --

THE COURT: Of the cases?

MS. WALLACE: Yes, sir. We're hoping. We've been meeting --

THE COURT: How do you think they'll end?

MS. WALLACE: Your Honor, I think there's an extremely good probability that if we can -- and we're meeting

Monday to work with the Justice Department, Adam Bain. We've been working in fact sheets --

THE COURT: They haven't made an offer yet.

MS. WALLACE: I know, sir, but we're trying to --

THE COURT: No money has been committed.

MS. WALLACE: Yes, sir. I think it's disgraceful, to be honest with you.

THE COURT: It'll be the year 2040 before the first case is paid out at this rate.

MS. WALLACE: Your Honor, I agree.

THE COURT: I understand, but I don't see any glimmer of any expectation that a case will settle or cases will settle. And, you know, I'm sensitive of the fact that I'm working with my colleagues and we're united in our effort, but yet I have individual obligations to do my job and so that's why we're here today.

MS. WALLACE: Yes, sir. That's what I'm hoping you'll do. You will look at these one by one.

We filed a motion to strike all of them, and I think it would be very helpful, if the Court has time, to go down all 17 of them.

When I hear them talk about, Your Honor, a tort case, Your Honor, contributory negligence --

THE COURT: A what kind of case?

MS. WALLACE: This is a statutory case.

THE COURT: I understand that.

MS. WALLACE: It's not a tort case.

THE COURT: I understand. That's what I said.

MS. WALLACE: When they mentioned contributory negligence, Your Honor, as a plaintiff's lawyer of 41 years in North Carolina, they allege contributory negligence, I have to prove gross negligence to overcome that. That opens every area of discovery that is completely contrary to the Camp Lejeune Justice Act.

I mean, it was our understanding that liability is not at issue. And so that's why I think the earlier the Court addresses these issues -- and we're hopeful we can address them today. I agree with everything both counsel to the left of me said, except if we can address them today. I don't think we should have to wait to ask the Government to address them in more detail on a motion or to amend them. I don't think we have to wait on discovery. I think we should put them out there, find out what the evidence is they have, what the real position is on it and ask them to quickly give us additional facts or they should be stricken.

So I'm -- I agree with Your Honor 100 percent. And I think until we know -- and we can address what these defenses are -- it's going to be more difficult for us to agree on fact sheets and we need the fact sheets to be able to get all the cases in the database to set up a settlement, or at least a

potential settlement or at least discussions.

THE COURT: What's your name?

MR. RHINE: Joel Rhine, Your Honor. I've been before you several times, Your Honor.

First, just in the *Iqbal* and *Twombly*, you got it right. You got it right back in 2015 in *Vandevender* when you applied *Iqbal* and *Twombly* to affirmative defenses and you quoted all the different cases. And you said that "in support of each of the challenged defenses, defendants asserts no facts at all." So you struck them, and you compared it to "tossing affirmative defenses into the case like a fish hook without bait." That's exactly what's happened here. That's exactly what's happened here in every single one of their defenses.

For example, on the 12(b)(6), on the failure to state a claim for relief can be granted, there's no facts whatsoever alleged. On the -- you can go through each and every one.

Judge, this is very similar to the *Reazer-Kremitzki* case, which was dealing with the Seventh Circuit where there was a conflict between whether or not *Iqbal* and *Twombly* would apply to a 12(b)(6). And the Court said it really doesn't matter. However, whether *Twombly* or *Iqbal* pleading standard applies likely makes little difference. Factual allegations that were sufficient before *Twombly* and *Iqbal* will likely still be sufficient and barebones affirmative defenses have always been insufficient.

So, Judge, if you go through each one of their defenses, the first affirmative defense, which is just we fail to state a claim for which relief can be granted, there's a question as to whether or not that is even really an affirmative defense. But even if it is an affirmative defense, they have to put some meat on the bones, and it's a barebones allegation just like you struck in 2015.

On the second affirmative defense whether or not it's the proximate cause of the injury. Again, they got to make some allegations. All of the -- it's just simply saying that -- let me back up.

On the causation, the causation is simply stated forth the elements of the plaintiffs' claim. A real affirmative defense is not one that just says you haven't met your burden of proof. And we've cited cases, Judge, that it is a defense which demonstrates that a plaintiff has not met its burden is not an affirmative defense. And that a defense of failure to state a claim is not an affirmative defense but is merely a negation of plaintiffs' claims. You can apply that to every one of the instances in which the Court -- which the defendants have just gone to our burden of proof and have alleged that we haven't met that. That's not a real affirmative defense.

Ms. Wallace was also absolutely correct when she talked about this negligence standard. They got to be careful

what they ask for. I mean, if we -- if they assert a negligence case, then we've got to go and prove gross negligence. We've got to show everything that happened out there. Also, this assumption of the risk, careful what you're asking for. Because if we assume the risk, we're going to bring in all that evidence that the Navy and the Marines knew, and hid it, and we've been told that all this evidence isn't coming in.

Well, if they bring that defense, it's coming in and that's going to make these cases longer and stronger. So I say on that one, make the defense.

THE COURT: Is that enough?

MR. RHINE: On the sixth affirmative defense, Your Honor, recovery is limited to any amount in the administrative claim. Again, that's not an affirmative defense. The statute sets forth what we have to do.

Judge, you know, on all of these, most of these 12(f)s are not favored; they are disfavored. The reason why they are disfavored is because it's usually a dilatory tactic. Well, here, Judge, just like in the *Reazer-Kremitzki* case, if it will declutter the files, then it will actually save time. And what we would like to do is to save time, declutter the files, take out all of these affirmative defenses, let's go try these cases on the real issues, which is the causation and damages. It's a strict liability statute.

Thank you, Judge.

THE COURT: Thank you. Mr. Bain, let me --

MR. BAIN: May I have a couple responses?

THE COURT: Yeah. But I wanted to speak to you just first about an inquiry.

Will trying some of these cases improve or detract from achieving a global settlement?

MR. BAIN: Trying some of these cases in a way which are representative of the larger claims will improve the prospects of settlement. So not trying the first cases that were filed based on just being in the courthouse first, but actually picking out representative cases, and if the sides cannot agree on values, for example, having trials might assist the resolution globally of all the claims.

THE COURT: Yeah. I'm not wedded to first in, first out. Best in, best out would be a better way to put it.

MR. BAIN: I agree, Your Honor.

THE COURT: Okay.

MR. BAIN: Just a couple points I wanted to make in response to the plaintiffs' argument.

They claim that our defenses are lacking because they don't have factual specificity responding to the plaintiffs' complaints, but the plaintiffs' complaints are so formulaic with respect to the disease and exposure that it's practically impossible to be factually specific in response with respect to

affirmative defenses.

THE COURT: If somebody says life-threatening conditions, what can you say? I mean driving too fast is a life-threatening condition.

MR. BAIN: That's right, Your Honor. We don't know what the specific disease is; we don't know where they were at Camp Lejeune; how they are exposed. So it's difficult in those circumstances to articulate factually specific affirmative defenses. So we raise them in order -- because Rule 8(c) says the affirmative defenses must be stated in the answer.

So at the time of the answer, affirmative defenses must be stated and then we have discovery to allow us to be able to see whether they are applicable or not. So that's our position on that.

Given the formulaic recitation in the plaintiffs' complaints, the affirmative defenses really can't be more factually specific at this point.

And then to the response to the argument this is a statutory action, not a tort action. Well, the Federal Court Claims Act is a statute as well. This is a remedy, a tort remedy against the United States like the Federal Tort Claims Act that provides certain circumstances in which the United States might be liable for personal injury or wrongful death, so it is a tort statute and there's a real question as to where the CLJA, the Camp Lejeune Justice Act, is silent what fills in

there, what -- the --

THE COURT: Well, the federal common law will probably fill in there and that will come from the Court.

MR. BAIN: Well, some common law will fill in.

THE COURT: The Court has some degree of creative ability to fashion the law and apply it to the claims in these cases.

MR. BAIN: That's right, Your Honor. And we would suggest that the Federal Tort Claims Act is a statute to look to because it looks to the analogous private liability and like circumstances and the relevant jurisdiction.

THE COURT: I think all the judges on this court, I don't speak for them collectively, but I can say that it's my opinion -- and I think they share it -- that we will be charged with the obligation of fashioning the federal common law to fit into the contours of this litigation.

MR. BAIN: That's right, Your Honor. That's the reason why, given that this is a brand new statute, there's no decisions out there, that we raise the defenses that we did. We took it very seriously. We researched the potentially applicable law. We consulted with the local U.S. Attorney's Offices about the potential affirmative defenses under North Carolina law and we asserted our defenses based on that.

It wasn't done reflexively; it wasn't done without any thought. This is a high-profile case, this is a new

statute and we were very careful in the affirmative defenses that we asserted. And many of them we asserted prefaced with the phrase "to the extent the evidence shows."

So I just want Your Honor to know this is a brand new statute. We asserted the affirmative defenses that we thought might be appropriate in this circumstance.

MS. WALLACE: Your Honor, may I? What's so concerning about that --

THE COURT: Well, I heard from you already, so if you don't mind.

MS. WALLACE: Yes, sir.

THE COURT: Is there anyone else?

MS. WALLACE: Nevin, sir.

THE COURT: Who are you?

MR. WISNOSKI: Thank you, Your Honor. May it please the Court. Nevin Wisnoski here on behalf of Kim Callan and Robert Tipton. Just a few points I'd like to point out, particularly in response --

THE COURT: Keep it brief.

MR. WISNOSKI: -- to the Government.

Sorry, Your Honor?

THE COURT: Keep it brief.

MR. WISNOSKI: Absolutely.

Even in what was just pointed out, the idea of potential factual predicates, it will be undisputed to the

facts -- to the extent the facts show. This is speculation. Speculation, even under North Carolina's lower notice pleading standard, is insufficient for an affirmative defense. So even if Your Honor doesn't find that *Iqbal/Twombly* applies -- and it does, and we've briefed that thoroughly -- even under a lower notice pleading standard, anything predicated as to the extent that facts shown with no facts alleged is insufficient as a matter of law.

THE COURT: Who are you?

MR. DEAN: Good afternoon, Your Honor. My name is Kevin Dean. I'm here on behalf of the Akers plaintiffs.

THE COURT: Yeah. Okay.

MR. DEAN: CV-120. Other counsel, Jim Roberts, is in trial so I --

THE COURT: I can hear from you today.

MR. DEAN: Yes, sir.

I just adopt all the arguments that have been made by plaintiffs' counsel, but I wanted the Court just to simply know that when Your Honor gets ready for us to try the Akers' case, we'll be ready to go.

THE COURT: Try the what case?

MR. DEAN: Akers, A-K-E-R-S. The estate of Dr. Paul Akers.

THE COURT: Why would I be ready to try that?

MR. DEAN: I was just passing along that my point was

there's not a lot of discovery we believe we need, so we would be ready for trial whenever Your Honor is ready regardless of how the rulings go with the defenses. That's all I have to say, Your Honor.

THE COURT: Okay.

MR. DEAN: Thank you.

THE COURT: Well, I think I've heard what I need to hear today, and I appreciate y'all attending. I know this is an important matter. We as a court are trying to be very conscientious but also very responsive both in the big way and in the little way. So hopefully this will bring justice to all concerned.

Thank you, and I'll be in recess.

* * *

(The proceedings concluded at 2:40 p.m.)

UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Amy M. Condon, CRR, RPR, CSR, Federal Official Court Reporter, in and for the United States District Court for the Eastern District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 23rd day of June, 2023.

Amy M. Condon
______________________________

/s/ Amy M. Condon
Amy M. Condon, CRR, CSR, RPR
U.S. Official Court Reporter